IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>-vs-<br><br>RICKY RAY CRESPIN,<br><br>Defendant. | **ORDER AND**<br>**MEMORANDUM DECISION**<br><br><br><br>Case No.  1:07-cr-43 TC |

Defendant Ricky Ray Crespin has filed a Motion to Suppress Evidence.  Arguing that the police lacked reasonable suspicion for an investigative stop and subsequent detention, Mr. Crespin seeks the suppression of the firearm discovered as a result.

Because the police officers had reasonable suspicion of criminal involvement to justify the initial stop, and then had additional reasonable suspicion for a brief investigatory detention, Mr. Crespin's motion is DENIED.

### **Findings of Fact**

On March 25, 2007, Ogden Peace Officer Ken Huckaby—who has four and one-half years of experience with the Ogden Gang Unit—was patrolling an area referred to as "ground zero" because "that's where everything happens."  (Tr. 6.)[1]  Just after 6:00 in the evening, while "it was still pretty bright out," (id.) Officer Huckaby heard on the radio that a "male wearing a white hat, white shirt, on the corner of 27th and Madison, shot at a green Jetta, and the car left

---

[1]All transcript citations refer to the Evidentiary Hearing for Mr. Crespin's Motion to Suppress, held on September 28, 2007.

the area." (Id. at 7.)  Officer Huckaby, who was only four blocks away, drove quickly to the scene.  He arrived there within one to two minutes of hearing the report.

As Officer Huckaby pulled up to the intersection, he saw several Hispanic men dressed in gang attire with shaved heads climbing into a green minivan.  He saw no other activity in the intersection or any other cars leaving.  (Id. at 14.)  The minivan pulled away from the intersection, and drove towards Officer Huckaby.  As the minivan passed Officer Huckaby, he noticed one passenger "look[ed] like the person that I'd been after for a while that had the felony warrants," he "recognized [another passenger] as a known gang member," and he "could tell . . . somebody in the back was wearing a hat."  (Id. at 12, 43.)  Officer Huckaby also believed that the occupants had an "oh crap look" when they saw him.  (Id. at 13-14.)  Believing that the people in the minivan may have somehow been involved with the shooting—or may have been witnesses to the shooting or were transporting a victim to the hospital—and seeing no other potential victims or witnesses at the intersection, Officer Huckaby stopped the minivan.

With the minivan stopped, Officer Huckaby was better able to see who was inside the vehicle.  He became more concerned that the minivan was involved in the shooting once he recognized Mr. Crespin in the rear seat of the car—whom the police wanted for questioning about some violent crimes—as well as another passenger whom the officer had previously apprehended.  Based on information that "[t]hese guys had supposedly been armed," Officer Huckaby became increasingly concerned for his safety.  (Id. at 20.)  He drew his gun and ordered the passengers to put their hands on the seat in front of them.

While the passengers' hands were on the seats in front of them, Officer Scott Eggerman—the officer initially dispatched to the shooting—arrived.  Officer Eggerman stood

2

next to the rear passenger side of the minivan with his gun in hand.  The rear passenger window was missing, so Officer Eggerman could easily see into the rear of the minivan.   From that vantage point, he observed Mr. Crespin repeatedly drop his hands from the seat in front of him, as "if he was reaching for something."  (Id. at 48.)  Each time Mr. Crespin lowered his hands, Officer Eggerman ordered him to put his hands back on the seat.  Although Mr. Crespin would initially comply, he lowered his hands at least two or three additional times.  With Officer Huckaby and Officer Eggerman standing outside the minivan, Officer Bret Connors arrived and stood near the front passenger door.  The officers then removed the passengers from the minivan, patted them down, asked their names, and sat them down on the curb.

Although the other passengers complied with the officers' orders to sit on the curb, Mr. Crespin remained in a crouching position by the curb.  (Id. at 62.)  Officer Huckaby repeatedly told Mr. Crespin to sit down on the curb, but—after briefly complying—Mr. Crespin only returned to his crouching position.  Several times, Mr. Crespin told the officers that he needed his coat or his cigarettes, and reached toward the missing rear window of the minivan.  At one point, claiming that he wanted his coat, Mr. Crespin actually reached through the missing rear window. But when the officers ordered him to drop the coat, he complied.

With the passengers sitting on the sidewalk, Officer Huckaby sent Officer Eggerman back to the intersection to look for victims and witnesses.  Officer Huckaby then started to speak with the driver and learned that she was the daughter of the minivan's owner.  He asked the driver if there were any guns in the minivan.  She answered no, and the officer asked "'[y]ou don't mind if I look then?'"  (Id. at 25.)  The driver did not say anything for a few seconds, leading the officer to respond, "'[g]reat.  Have a seat here.  I'm going to check your van out.'"  (Id.)  Starting

3

with the front of the minivan, Officer Huckaby quickly climbed through the vehicle looking for weapons. He found nothing until he reached the back of the minivan, where Mr. Crespin had been sitting. On the rear seat, he found a gun underneath a jacket.

Immediately after Officer Huckaby found the gun, Officer Eggerman called to inform Officer Huckaby that he found a witness. The witness confirmed that the person who fired the shot was dressed totally in white, as was Mr. Crespin. Shortly after that—within fifteen minutes of the initial traffic stop—a witness identified Mr. Crespin as the person who fired the shot. Officer Huckaby then arrested Mr. Crespin.

## Analysis

Mr. Crespin concedes he does not have standing to challenge the search of the minivan. But the Supreme Court recently ruled that passengers have standing to challenge the reasonableness of a traffic stop because a "traffic stop necessarily curtails the travel a passenger's travel . . . ." Brendlin v. California, 127 S. Ct. 2400, 2407 (June 18, 2007).

Accordingly, the issue before the court is whether the stop and subsequent detention of the occupants of the minivan constituted an unreasonable seizure. "First, we must decide whether the detention was 'justified at its inception.'" United States v. Johnson, 364 F.3d 1185, 1189 (10th Cir. 2004) (quoting Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1028 (10th Cir. 1997)). "Second, the officer's actions must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" Id. (quoting United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996)).

## I.    Initial Stop

Officer Huckaby had a reasonable suspicion that the minivan was involved in criminal

4

activity to justify the initial traffic stop.

"A traffic stop is a Fourth Amendment seizure 'even though the purpose of the stop is limited and the resulting detention quite brief.'" United States v. Alcaraz-Arellano, 441 F.3d 1252, 1257 (10th Cir. 2006) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)). Under the principles of Terry v. Ohio, 392 U.S. 1 (1968), "law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity." United States v. Hensley, 469 U.S. 221, 226 (1985); see also United States v. Harris, 313 F.3d 1228, 1234 (10th Cir. 2002) (explaining police may stop an individual "if the officer has a reasonable and articulable suspicion that the person might be involved in criminal activity."). Courts must "examine the events that occurred leading up to the stop to determine whether the 'historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or probable cause.'" United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). When evaluating whether there was reasonable suspicion, the Tenth Circuit has "explained that 'an officer with reasonable suspicion need not rule out the possibility of innocent conduct as long as the totality of the circumstances suffices to form a particularized and objective basis' for a stop." United States v. Moran, 503 F.3d 1135, 1140 (10th Cir. 2007) (quoting Vercher, 358 F.3d at 1261).

Here, the totality of the circumstances established a reasonable suspicion that the minivan was involved in criminal activity.

First, Officer Huckaby observed individuals dressed in gang attire with shaved heads climb into the minivan, creating suspicion that the occupants were involved in criminal conduct.

5

See <u>United States v. Feliciano</u>, 45 F.3d 1070, 1074 (7th Cir. 1995) ("Knowledge of gang association and recent relevant criminal conduct, while of doubtful <u>evidentiary</u> value in view of the strictures against proving guilt by association or by a predisposition based on past criminal acts, is a permissible component of the articulable suspicion required for a <u>Terry</u> stop.").

Second, the minivan drove away from the location of a reported shooting. Officer Huckaby arrived less than two minutes after learning of the shooting, and saw no other activity and no one else leaving the area. Based on these facts, as well as his years of experience with the gang unit, the officer believed that the people in the van "were somehow involved" in the shooting. (Tr. 15.) See <u>United States v. Gutierrez-Daniez</u>, 131 F.3d 939, 942 (10th Cir. 1997) ("In every case, . . . the officer 'is entitled to assess the facts in light of his experience' in detecting criminal activity.") (quoting <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 885 (1975)); <u>see also</u> <u>United States v. Villa-Chaparro</u>, 115 F.3d 797, 801 (10th Cir. 1997) (quoting <u>United States v. Alvarez</u>, 68 F.3d 1242, 1244 (10th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1143 (1996)) ("'This approach is intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'").

Third, the minivan was leaving a known high-crime area, which the police call "ground zero." <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000) ("[T]he fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a <u>Terry</u> analysis").

Fourth, as the minivan drove past the officer, one of the passengers "look[ed] like the person that [the officer had] been after for a while that had felony warrants." (Tr .at 12.) Although the passenger was not the person Officer Huckaby suspected, the officer credibly

testified that he believed the passenger had a felony warrant, supporting the reasonableness of the initial stop.[2]  See United States v. Curls, 219 Fed. Appx. 746, 753 (10th Cir. 2007) (citing United States ex rel. Kirby v. Sturges, 510 F.2d 397, 401 (7th Cir. 1975) ("[A]n arrest or stop based upon a reasonable mistake as to identity is lawful.")).  "A police officer may stop and briefly question an individual who he reasonably suspects of criminal activity or who he reasonably believes is the subject of an arrest warrant."  United States v. Alcantar-Garcia, No. 05-60137, 2006 WL 2882828, at *3 (D. Or. Oct. 6, 2006).

And fifth, after seeing Officer Huckaby's marked police car, all occupants of the minivan reacted with the "oh crap look," resembling "somebody that's got something to hide . . ."  (Tr. 13.)  See United States v. Zambrano, 76 Fed. Appx. 848, 850 n.1 (10th Cir. 2003) ("[W]hen occupants of the car 'exhibit surprised or scared facial expressions, widen their eyes, look back to watch the Border Patrol vehicle go by, return to looking straight forward with both hands gripping the steering wheel, look a second time, and then stare straight forward again,' we have found such behavior to support a finding of reasonable suspicion.") (quoting United States v. Barron-Cabrera, 119 F.3d 1454, 1457-58 (10th Cir. 1997)).

Based on the totality of the circumstances, Officer Huckaby had a reasonable suspicion that the minivan was involved in criminal activity to justify stopping the vehicle.

## II.    Scope of Detention

After Officer Huckaby stopped the minivan, there was reasonable concern for officer safety to justify the brief detention.

---

[2]Notably, that particular passenger **did** have an outstanding warrant, but—in an abundance of candor—Officer Huckaby explained that he had mistaken the passenger for someone else when he believed the passenger had an outstanding warrant.  (See Tr. 30-31.)

7

As the Tenth Circuit has explained, "not only must the seizure be justified at its inception, but . . . the scope of seizure employed must also be reasonable under the circumstances." United States v. Maddox, 388 F.3d 1356, 1367 (10th Cir. 2004); Gutierrez-Daniez, 131 F.3d at 942 ("An investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the detention."). "During an investigative detention, '[p]olice officers are authorized to take reasonable steps necessary to secure their safety and maintain the status quo.'" United States v. Garcia, 459 F.3d 1059, 1063 (10th Cir. 2006) (quoting United States v. Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998)). Consequently, a police officer may "'conduct a pat-down search (or "frisk") if he or she harbors an articulable and reasonable suspicion that the person is armed and dangerous.'" Id. at 1064 (quoting United States v. Hishaw, 235 F.3d 565, 570 (10th Cir. 2000)).

Here, the additional brief detention was reasonably related to concerns for officer safety. Terry, 392 U.S. at 27 ("[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.").

Immediately after stopping the van, Officer Huckaby recognized members of a local gang. See Garcia, 459 F.3d at 1066 ("The apparent gang connection provides additional reason to uphold the district court's conclusion in this case" that a frisk was supported by reasonable suspicion.). He also recognized two of the passengers as people who "had supposedly been armed." (Tr. 20) Additionally, Mr. Crespin was wearing all white, matching the reported description of the gunman in the exact intersection that Mr. Crespin was leaving. See Hensley, 469 U.S. at 229 ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed

felony, then a <u>Terry</u> stop may be made to investigate that suspicion.").

     Mr. Crespin's uncooperative behavior created additional concern for officer safety. While inside the minivan, Mr. Crespin repeatedly defied orders to keep his hands on the seat in front of him, lowering his hands several times out of the officers' visibility.  <u>See</u> <u>United States v. Ridley</u>, No. 97-3319, 1998 WL 778381, at *3 (10th Cir. Nov. 2, 1998) ("Although we do not believe a 'furtive' movement, standing alone, supports a <u>Terry</u> search, we think it is a factor to consider when examining reasonable suspicion.").  Mr. Crespin continued to disobey orders when the passengers were removed the minivan.  Rather than sit on the curb, he crouched in an antagonizing "fight or flight" position.  <u>See</u> <u>United States v. Ellis</u>, 180 Fed. Appx. 827, 829 (10th Cir. 2006) ("Given the totality of the circumstances, especially **in light of Appellant's non-compliance** in a charged situation, we determine that the officers had reasonable suspicion to conduct a frisk for weapons.") (emphasis added).  And Mr. Crespin stood up several times to reach inside the minivan, which the officers had not yet searched for firearms.  <u>See</u> <u>United States v. Driskill</u>, No. 98-6331, 1999 WL 730954, at *2 (10th Cir. Sept. 20, 1999) ("[T]he totality of the circumstances here support Agent Roberts' reasonable suspicion that Mr. Driskill was reaching for a weapon.").

     Faced with these concerns, a reasonably prudent person would have feared for his safety. Consequently, there was reasonable justification for the fifteen minute investigation and pat-down.  <u>See</u> <u>United States v. Dennison</u>, 410 F.3d 1203, 1211 (10th Cir. 2005) ("A police officer may also 'perform a patdown of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous.'") (quoting <u>Knowles v. Iowa</u>, 525 U.S. 113, 118 (1998)).

## **Order**

For the reasons stated, the court DENIES Mr. Crespin's Motion to Suppress Evidence

(dkt. #19).


SO ORDERED this 28th day of November, 2007.



BY THE COURT:

TENA CAMPBELL
Chief Judge